UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.

Frederick Drane

Criminal No. 13-cr-31-JL
Opinion No. 2014 DNH 150

**MEMORANDUM ORDER**

This case raises questions about the scope of police searches conducted during two separate traffic stops of the defendant, Frederick Drane.  In moving to suppress the evidence seized in these encounters, Drane argues that the police "exceed[ed] the scope of the traffic stop" by, during the first incident, asking him whether he had drugs on his person and then conducting a pat-down search and, during the second incident, questioning Drane and his co-defendant, Holly Lebo, about drugs. While Lebo consented to the search of the car that allegedly turned up the incriminating evidence, Drane argues that her consent was invalid because the police obtained it only after having "deprived him of any chance to object to the search as somebody with an equal property interest in the car."  By way of a subsequent motion to suppress, filed just prior to trial, Drane also seeks to exclude his alleged statement to the officers searching the car that they would find a crack pipe in the driver's side door, arguing that the statement was obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).

After two evidentiary hearings, one on each motion, the court orally denied both motions to suppress.  This order serves to set forth the bases for those rulings in greater detail.  See, e.g., United States v. Joubert, ___ F. Supp. 2d ___, 2014 DNH 046, at 2 n.1 (noting a district court's authority to later reduce its prior oral findings and rulings to writing).  As fully explained below, the conduct of the police during the traffic stops did not violate Drane's rights against unreasonable search or seizure under the Fourth Amendment.  Based on the circumstances giving rise to the first stop, and the behavior of Drane and his brother during the stop--which suggested Drane's recent involvement in a violent altercation over a drug-related debt--the police had reasonable suspicion both to ask him whether he had drugs on his person and to pat him down for weapons.  In any event, at the time of the first stop, Drane was subject to bail conditions that required him to submit to searches of his person without any degree of suspicion.

Drane's objection to the evidence allegedly seized in the second traffic stop stands on even weaker footing.  Even were the court to assume that Drane had a reasonable expectation of privacy in the vehicle (which had been rented to Lebo without any authorization allowing Drane to drive it), the police obtained consent to search the vehicle from Lebo, not from Drane--and

2

Drane has not argued that Lebo's consent was involuntary.  While Drane invokes the holding of Georgia v. Randolph, 547 U.S. 103, 120 (2006), that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable on the basis of consent given to the police by another resident," he has provided no authority applying this rule to a shared vehicle and, in any event, he does not claim that he objected to the search, only that he was never asked whether he did.  But Randolph expressly holds that a "potential objector, nearby but not invited to participate in the . . . colloquy [over consent], loses out" on his chance to object--at least where, as Drane concedes is the case here, "there is no evidence that the police [] removed the potentially objecting [defendant] . . . for the sake of avoiding a possible objection." Id. at 121.  The bottom line is that Lebo's valid consent justified the search of the vehicle in the second stop.  Finally, even if Drane was in custody when he informed the officers of the presence of the crack pipe in the vehicle, that statement was not the product of interrogation, and therefore could be used against Drane at trial without violating his Fifth Amendment rights.

I.   **Background**

The court makes the following findings of fact based on the testimony and other evidence received at the suppression hearing.

**A.   First traffic stop (June 2012, Biddeford, Maine)**

On the mid-morning of a day in June 2012, James Michael Penney, a patrol officer for the city of Biddeford, Maine, received a report of "vehicles stopped in traffic and that there were males outside of the vehicles physically fighting" at a nearby intersection known as "Five Points."  As Penney headed toward the intersection, he spotted one of the vehicles described in the report, so he maneuvered his cruiser into position behind the vehicle and activated his flashing lights.  The vehicle promptly pulled over into the driveway of a house.  As Penney pulled his cruiser into the driveway, a man--later identified as Drane--exited the front driver's side of the vehicle and began walking toward the house, despite Penney's order to stop.  Drane halted, however, at the direction of another man--later identified as Drane's brother, Leroy--who exited the front passenger's side of the vehicle, exhorting, "Come back, we didn't do anything wrong."  In the meantime, a woman--later identified as Lebo--emerged from the house.  Penney approached the men and asked their names, which he then radioed in to his dispatcher. Another Biddeford officer, Lawrence Angis, arrived on the scene.

4

Observing blood running down one of Leroy's hands, the officers asked the Dranes what had provoked the fight at the Five Points intersection.  In the ensuing conversation, Leroy said that the fight started over $700 that a married couple, Mark and Amanda Barton, had borrowed from the Dranes to use as bail money for Mark Barton.  Leroy reported that the Dranes had found the Bartons at a gas station where, the officers knew, drug and other criminal activity were prevalent.  According to Leroy, the Dranes had asked the Bartons for repayment, but Mark Barton refused, using a racial slur to refer to Leroy.  The Bartons then left in their vehicle, Leroy said, but he and his brother followed in their car until both groups reached Five Points.  There, Leroy recounted, he and his brother exited their vehicle to confront the Bartons, who also left their car, sparking a physical altercation.  Leroy reported that, in this altercation, he cut his hand, and the front windshield of the Dranes' vehicle was smashed by a coffee mug.  But, when Officer Angis asked the Dranes if they wanted to pursue charges based on this incident, they declined (though they did give the police brief written statements).  Angis also observed that Drane "was sweating profusely and he was very quiet and seemed very nervous."

    In the meantime, Penney learned via radio that Drane was not licensed to drive in Maine and that his license in

5

Massachusetts was suspended, as well as that Drane was subject to bail conditions that prohibited him from operating a motor vehicle.  Penney decided that, as result, he would place Drane under arrest for unlicensed operation and violation of his bail conditions.  Penney did not immediately do so, however, because Angis (the other officer who had responded) informed him that the Maine Drug Enforcement Agency ("Maine DEA," a state agency) had an agent en route to the scene.  Penney explained that, as a matter of routine practice, the Biddeford Police Department immediately reported any drug-related incident to the Maine DEA, who frequently dispatched an agent to the scene in response.

After what Penney recalls as another "five to ten minutes," an agent from the Maine DEA, Michael Reali, arrived on the scene. There, Reali learned, from Officer Penney, Leroy's account of the altercation with the Bartons.  Reali also learned, from Officer Angis, that Drane had been "acting very nervous and sweating." Based on this information, Reali suspected that the Dranes and the Bartons had been fighting over money owed for drugs (rather than, as Leroy had claimed, for Mark Barton's bail).  In fact, Reali had been investigating both the Dranes and the Bartons for suspected drug trafficking.

Reali also knew that Drane was at that point subject to bail conditions, issued by the Biddeford District Court on May 8,

2012, following his appearance on charges including the unlawful possession of scheduled drugs in violation of Me. Rev. Stat. Ann. tit. 17-A, § 1107-A.  As part of these bail conditions, Drane had agreed not to use or possess illegal drugs and that, "[i]n order to determine if [he] ha[d] violated any prohibitions of [the] bond regarding . . . illegal drugs," he would "submit to searches of [his] person, vehicle and residence . . . at any time without articulable suspicion or probable cause."

Reali approached Drane, who was "shaking" and "sweating," identified himself, and asked whether Drane had any drugs on him. Drane said he did not.  Reali then asked Officers Penney and Anglis whether they had searched Drane.  They said they had not. When Reali asked Drane, again, whether he had any drugs on his person, Drane "got really nervous" and gave an answer that was "shaky" and "inaudible."  Reali then began patting Drane down, starting at his waistline.  Reali felt what seemed to be a "blunt instrument" in Drane's pocket; when he declined to identify the object, Reali pulled it from the pocket, revealing "an 8-inch piece of sharpened metal, almost like a cut coat hanger." Recognizing this as a tool commonly used to scrape out a crack pipe, Reali asked Drane, again, whether he had any drugs on him. Drane acknowledged that he had drugs in his underwear.  On Reali's orders, Drane reached into his pants and pulled out a

glassine bag containing what turned out to be nearly 10 grams of crack cocaine.  Officer Penney then placed Drane under arrest for operating without a license and violation of his bail conditions.

### B.    Second traffic stop (September 2012, Hampton, New Hampshire)

After midnight on a mid-September evening, Trooper John Kelly of the New Hampshire State Police was on patrol along Interstate 95 in Hampton, New Hampshire when he observed a vehicle traveling more than 80 miles an hour in a 65-mile-an-hour zone.  Kelly began to follow the vehicle, a black Dodge Charger, in his cruiser, activating its flashing lights and spotlight.  As the Charger pulled to the side of the road, Kelly observed the driver "jump" from the driver's seat into the back seat, while the sole passenger moved from the front passenger seat into the driver's seat.  As Kelly exited his cruiser and approached the Charger, he noticed that the man who was now in the back seat "lying completely down with his eyes closed like he was sleeping," while the woman now in the driver's seat "was struggling kind of to sit . . . the way the seat was positioned," with her feet apparently unable to reach the pedals.  As Kelly eventually learned, the man was Drane, and the woman was Lebo.

Kelly asked Lebo where she had come from, and she responded, "I was just driving home to Maine."  Because Kelly, who had not

8

been fooled by the seat-switching, knew that Lebo had not in fact been driving, he asked her to step out of the vehicle so that he could question her further.  During that conversation, Lebo admitted that Drane had actually been driving, and that they had switched positions upon seeing Kelly's cruiser because Drane's driver's license was suspended.  Lebo also told Kelly that she and Drane had been visiting his relatives in Boston's Mattapan, neighborhood and were on their way back to their home in Maine.

During Kelly's conversation with Lebo, Drane "started to jump out of the car at one point," but Kelly ordered him to stay inside the vehicle.  Kelly also noticed that Drane "was fidgety in his seat and would not break eye contact" with the trooper, "leering at [him] through the back window" in a way that Kelly found "unsettling" and "very unusual."  So Kelly called for backup, which soon arrived in the form of Troopers Anthony Cattabriga and Kevin Devlin.  At that point, Kelly approached the Charger so that he could speak with Drane, who was still sitting in the backseat, while Cattabriga remained with Lebo, who at that point was standing in front of Kelly's cruiser.

Kelly asked Drane where he was traveling from, and Drane responded that he and Lebo had visited his mother's house in Mattapan, then gone "to his cousin's house and stayed a short while" before heading back toward Maine.  This differed somewhat

9

from Lebo's account of the pair's prior doings:  she had said
that, after visiting Drane's mother, they tried to visit the
house of his daughter, but nobody was home, so they left to
return to Maine.  Kelly also noticed that Drane was "fidgety" and
"talking quickly," and that his pupils were constricted (even
after Kelly had turned off the bright lights of his cruiser).
Kelly recognized these as signs that Drane might be under the
influence of drugs.  A check of Drane's name with dispatch
revealed "several entries for drug possession and possession with
intent to distribute."  Based on this information, as well as
Drane's behavior and the inconsistent accounts of his prior
whereabouts, Kelly decided to ask for consent to search the car.

    In the meantime, Lebo had told Trooper Cattabriga that the
Charger "was a rental vehicle" for which "her mom had fronted her
the money ahead of time because [Lebo's] vehicle was having
mechanical issues."  Kelly then asked Lebo, in whose name the
vehicle had been rented, for her consent to search it, explaining
that he had become suspicious due to Drane's criminal record and
behavior during the encounter, as well as the inconsistency in
their stories.  Kelly presented Lebo with the standard New
Hampshire State Police form used to memorialize consent for a
search, explaining that "she didn't have to let us search the car
at all if she didn't want to" and that "if at any time she wanted

10

to withdraw her consent, she could so." Lebo signed the form, indicating her consent to a search of the vehicle.

As Kelly was talking with Lebo, Cattabriga was keeping an eye on Drane, who had remained in the back seat of the Charger. The men began making "small talk," in Cattabriga's words, and he asked Drane why the car had been stopped and why he was sitting in the back seat. After Drane explained that he had hoped to avoid being charged for driving with a suspended license, Cattabriga asked Drane if he had ever been charged with that offense before. Drane "indicated that he had not. He indicated that most of his prior charges were assault and drug related charges." This prompted Cattabriga to ask Drane when he had last used drugs (he said it was four days prior) and what his drug of choice was (Drane said it was marijuana).

During their conversation, Cattabriga noticed that Drane was "making furtive movements with his hands, ducking in and ducking out," as well as rubbing the back of his head and neck. Concerned for his safety, Cattabriga directed Drane to step out of the vehicle and, after he did, handcuffed him. Cattabriga told Drane that "he was not under arrest" but "was being temporarily detained only as a safety precaution." After a pat-down revealed nothing of interest, Cattabriga brought Drane past the rear of the Charger--where, at that point, Kelly was

11

asking Lebo for her consent to search the car.  Cattabriga then began placing Drane in the back seat of Kelly's cruiser.  At that point, Drane "said something along the lines of, 'Don't forget my crack pipe in the driver's door.'"

The search of the Charger revealed the crack pipe in the door.  In addition, a purse on the passenger's seat was found to contain two large plastic baggies holding more than 30 grams of crack cocaine, several empty plastic baggies, and a digital scale.  The search also turned up two small plastic baggies of heroin on the driver's side floorboard.  Drane and Lebo were arrested and subsequently charged with possession of crack cocaine with the intent to distribute it, see 21 U.S.C. § 841(a)(1), and conspiring to do so, see id. § 846.

## II.  **Analysis**

### A.  **Fourth Amendment claims**

The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV, and these "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest," United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing, inter alia, Terry v. Ohio, 392 U.S. 1, 9 (1968)).  These encounters are known as "Terry stops," see, e.g., United States v. Mouscardy, 722 F.3d 68, 72 (1st Cir. 2013), after the Supreme Court's holding in Terry, supra, "that

12

the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause," United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30).

Assessing the reasonableness of a Terry stop, then, entails a two-step analysis:  first, the court must "ascertain whether the stop was justified at its inception," i.e., supported by reasonable suspicion, and, second, the court must "determine whether the actions undertaken during the stop were reasonably related in scope to the stop itself[,] unless the police had a basis for expanding their investigation." Mouscardy, 722 F.3d at 73 (quotation marks and bracketing by the court omitted).  In moving to suppress the evidence seized in the stops, Drane has not disputed that the police had reasonable suspicion to stop the vehicle he was driving in Biddeford, Maine in June 2012, or in Hampton, New Hampshire in September 2012.  Instead, he argues that the actions the police took after they stopped him in each instance "exceed[ed] the scope of the traffic stop."  As explained below, the court disagrees, and in any event, there was an independent basis supporting the search that ultimately took place during each of the stops--the bail conditions subjecting Drane to suspicionless searches of his person during the Maine

stop, and Lebo's consent to search the vehicle she had rented during the New Hampshire stop.

### 1. Maine stop

Drane argues that the police exceeded the scope of the traffic stop in Biddeford, Maine, by asking him whether he was in possession of drugs and, after these questions produced a denial and non-responsive behavior, patting him down.  During a traffic stop, "[i]f a law enforcement officer reasonably suspects criminal activity, he may briefly question the suspect about his concerns.  If [the officer] has a reasonable basis to suspect that the subject of his inquiry may be armed, he may also frisk the suspect."  United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002) (citations omitted).  Whether such suspicions are reasonable, of course, depends upon the totality of the circumstances confronting the police.  See, e.g., United States v. Cortez, 449 U.S. 411, 417 (1981).  Here, the totality of the circumstances gave the police an objectively reasonable basis to suspect that Drane was in possession of both illegal drugs, so as to justify his brief detention while they questioned him on that subject, and a weapon, so as to justify patting him down.

The police had stopped Drane's vehicle as he left what his brother and companion, Leroy, had acknowledged as a violent dispute with two other people, the Bartons, over an alleged

debt--a dispute that had erupted when the Drane brothers
encountered the Bartons at a spot known to the police for drug
activity.  "[O]n its own, of course, the character of the
location where [the defendant's activity] occurs is insufficient
to create reasonable suspicion," but neither must officers
"ignore the relevant characteristics of a location in determining
whether the circumstances are sufficiently suspicious to warrant
further investigation."  United States v. Rabbia, 699 F.3d 85, 90
(1st Cir. 2012) (quotation marks omitted).

It was not only where Drane had been, i.e., at a gas station
associated with the drug trade, but what he had been doing there,
i.e., getting into an argument over a debt that escalated into a
reported fight at a busy intersection in the middle of the day,
that contributed to a reasonable suspicion that he was in
possession of drugs.  See, e.g., United States v. Chapman, 305
F.3d 530, 534 (6th Cir. 2002) (finding that defendant's recent
flight from the site of known drug activity, coupled with a
report that a man meeting his description had been involved in a
fight at that location, established reasonable suspicion that
defendant was involved in drug activity).  Indeed, there is a
"well-known relation between drugs and violence," United States
v. Legarda, 17 F.3d 496, 502 (1st Cir. 1994), particularly
violence in city streets.

15

It is true that, before Reali began asking Drane whether he had drugs on his person, his brother, Leroy, had said that their fight with the Bartons was over money loaned for a potentially legitimate purpose, i.e., to post Mark Barton's bail.[1]  But "[a] reasonable police officer is not required to credit a suspect's story."  Cox v. Hainey, 391 F.3d 25, 32 n.2 (1st Cir. 2004). Here, the officers had a solid reason to doubt Leroy's account of the basis of the debt, since, even after the fight ended with Leroy's hand bloodied and the windshield of their car smashed, the Dranes declined to pursue charges against the Bartons.  While a reasonable officer could ascribe innocent motives to this choice (perhaps, for example, the Dranes were fearful over further angering the Bartons by setting the police after them), it was likewise reasonable for the police to infer that the Dranes were seeking to eschew any further police investigation into the fight because it might reveal inculpatory information about the Dranes themselves.  "'Under Terry, the test is whether the circumstances give rise to a reasonable suspicion of criminal activity, not whether the defendant's actions are subject to no reasonable innocent explanation.'"  Rabbia, 699 F.3d at 90

---

[1]Of course, is not uncommon for one person to post bail for another because the two are engaged in a joint criminal enterprise that faces disruption from the pre-trial detention. Cf. United States v. Slagg, 651 F.3d 832, 845 (8th Cir. 2011).

(quoting United States v. Stanley, 915 F.2d 54, 57 (1st Cir. 1990)).  In any event, Leroy's story that the money had been loaned to bail Mark Barton out of jail--even if believed--creates a potentially inculpatory inference.  See note 1, supra.

Furthermore, Drane, for his part, was "sweating profusely" and "seemed very nervous" during his brother's explanation of an incident in which, by Leroy's stated view at least, the Dranes "didn't do anything wrong."  Drane had also attempted to head straight into Lebo's house after parking the vehicle in her driveway, despite Officer Penney's commands to stop.  A suspect's evasive and nervous behavior during a stop can contribute to reasonable suspicion of criminality.  See, e.g., United States v. Hart, 674 F.3d 33, 38-40 (1st Cir. 2012); United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009).

Based on the foregoing circumstances, then, it was reasonable for the officers to suspect that the fight between the Dranes and Bartons had its origins in drug trafficking (whether it was money owed for drugs or some other issue).  Based on that suspicion, in turn, it was reasonable for the officers to question Drane about his possession of drugs--in light of the law that, as already noted, "[i]f a law enforcement officer reasonably suspects criminal activity, he may briefly question the suspect about his concerns" during a Terry stop.  Cook, 277

17

F.3d at 85 (citing, inter alia, Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).

Drane argues that, in fact, questions about his possession of drugs "bore no relation to the initial purpose of the traffic stop," relying on a case from the Seventh Circuit Court of Appeals where, after stopping a vehicle for a moving violation, the police asked its occupants whether they possessed drugs, despite lacking reasonable suspicion that they did. United States v. Childs, 256 F.3d 559, 564-65 (7th Cir. 2001).[2]   Here,

---

[2]While that opinion concluded that, as a consequence, the questioning violated the Fourth Amendment, the Seventh Circuit, sitting en banc, later reversed the panel decision on that point, United States v. Childs, 277 F.3d 947, 954 (7th Cir. 2002)--a development that, regrettably, Drane's original counsel failed to acknowledge in citing Childs to this court.  The en banc court held that "[q]uestions asked during detention may effect the reasonableness of that detention (which is a seizure) to the extent that they prolong custody, but questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable or require suppression of evidence found as a result of the answers"--even if they are "questions in search of information about other offenses" for which the police lack reasonable suspicion.  Id. at 949-50.

Incidentally, this view of Terry stops has proven controversial.  See, e.g., 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.3(b), at 491-507 (5th ed. 2012) (criticizing this holding and citing cases that have rejected it).  Our Court of Appeals, for its part, has deemed it "not clearly established" that the Fourth Amendment prohibits questioning a suspect about crimes unrelated to the purpose of the stop in the absence of reasonable suspicion of those crimes. Estrada v. Rhode Island, 594 F.3d 56, 64 (1st Cir. 2010) (granting qualified immunity to officer on claim that he violated plaintiff's Fourth Amendment rights by questioning her, without reasonable suspicion, about immigration law violations after

though, the "initial purpose of the traffic stop" was not to
investigate a moving violation, but to investigate a report of a
violent altercation between two groups of people at a busy
intersection in the middle of the day, near a location known for
its association with the drug trade.  Because, as just discussed
at length, the circumstances of that fight, combined with the
unusual behavior of Drane and his brother during the resulting
stop, provided reasonable suspicion to think that the fight had
arisen out of a drug trafficking dispute, the officers did not
transform a permissible traffic stop into an impermissible one
simply by asking Drane whether he had drugs on him.[3]  See Cook,
277 F.3d at 86-87 (ruling that suspect's participation in
behavior common to drug transactions, in a neighborhood known for
them, and his furtive actions upon noticing the police, provided

---

stopping her vehicle for an unsignaled lane change).  But
deciding Drane's motion to suppress does not require resolving
that issue since, as discussed in the main text, the purpose of
the stop was not a traffic violation, but a street fight, and the
police had reasonable suspicion that Drane was involved in the
criminal activity they asked him about, i.e., drug possession.

[3]It is true that, while waiting for Agent Reali to arrive to
question Drane, the police detained him for "five to ten minutes"
(in addition to the time that had passed while Officers Penney
and Angis were questioning the Dranes about their altercation
with the Bartons).  Drane, however, has not argued that the stop
was illegal as a result of its duration and, in any event, the
Court of Appeals has found that detentions of around the same
length "did not exceed the boundaries of a permissible Terry
stop."  Mouscardy, 722 F.3d at 74 (citing other decisions by the
Court of Appeals upholding stops of approximately 30 minutes).

reasonable suspicion to "briefly detain and question" him about whether he was in possession of a gun or other contraband).

In large part, the same circumstances that gave the police reasonable suspicion to ask Drane whether he possessed drugs also gave them reasonable suspicion to frisk Drane to determine whether he possessed a weapon.  Again, the police reasonably believed that the Dranes' effort to collect a drug debt from the Bartons had sparked the brawl, and "drug dealing is often associated with access to weapons."  Rabbia, 699 F.3d at 92 Indeed, the fact of Drane's recent participation in a fight, whatever its cause, itself supports the decision to check him for weapons.  See Mouscardy, 722 F.3d at 75 ("When an officer has a reasonable suspicion that a crime of violence has occurred, the same information that will support an investigatory stop will without more support a frisk.") (quotation marks omitted).  These circumstances, combined with Drane's nervous and evasive behavior throughout the encounter--including both his attempt to head into Lebo's house despite Penney's commands to halt, and his "shaky" and "inaudible" answers to Reali's questions--provided ample justification for the police to frisk Drane.  See id. at 75-76 (upholding pat-down of detainee "suspected to have committed a violent crime" who also refused to answer questions and became "agitated and nervous").

20

Finally, even if the police lacked reasonable suspicion to search Drane for weapons, that search nevertheless did not violate Drane's Fourth Amendment rights.  At the time of the traffic stop, Drane was subject to bail conditions that, "[i]n order to determine if [he] ha[d] violated any prohibitions of [the] bond regarding . . . illegal drugs," he would "submit to searches of [his] person . . . at any time without articulable suspicion or probable cause."  The Court of Appeals has ruled that, "even in the absence of articulable suspicion," similar bail conditions "independently justified" the police in searching a suspect, "see[ing] no reason why [it] should not give the plain language of the bail condition force and effect."  United States v. Gates, 709 F.3d 58, 64 (1st Cir. 2013).  The same result is in order here--particularly since Drane has not argued otherwise. Because the officers' actions toward Drane after they stopped him in Biddeford, Maine, in June 2012 did not violate his Fourth Amendment rights, his motion to suppress the evidence resulting from that stop (including the crack cocaine he ultimately produced from his underwear) is denied.

### B.  New Hampshire stop

Drane argues that, after stopping the vehicle he had been driving for speeding in Hampton, New Hampshire, in September 2012, the police "lacked a basis to expand the scope of the

21

traffic stop for speeding into a search of the car for drugs."
The difficulty with this argument is that the "basis" for that
search was Lebo's consent (as opposed to the probable cause that
searching the car would otherwise have required, see Carroll v.
United States, 267 U.S. 132 (1925)).  The prosecution can
"justify a warrantless search"--and ensure the admissibility of
the resulting evidence against the defendant notwithstanding any
Fourth Amendment objection--by "show[ing] that permission to
search was obtained from a third party who possessed common
authority over or sufficient relationship to the premises or
effects sought to be inspected."  United States v. Matlock, 415
U.S. 164, 171 (1974) (footnote omitted); see also, e.g., United
States v. Carrasco, 540 F.3d 43, 49 (1st Cir. 2008).

        Drane has not questioned that Lebo had "authority over or
sufficient relationship to" the car she permitted the police to
search, which, after all, she had rented in her name.[4]  See

_____

        [4]Drane argues that, even though the rental agreement did not
authorize him to drive the vehicle, he nevertheless had a
reasonable expectation of privacy in it, enabling him to
challenge the search.  As Drane acknowledges, some "circuits have
held that persons driving a rental car without the authorization
of the rental company have no standing to challenge the validity
of the search, because they have no legitimate expectation of
privacy in such circumstances," United States v. Riazco, 91 F.3d
752, 755 (5th Cir. 1996) (citing cases), while another has held
that "as a general rule, an unauthorized driver of a rental
vehicle does not have a legitimate expectation of privacy in the
vehicle," while refusing to adopt "a bright line test . . . based
solely on whether the driver of a rental vehicle is listed on the

United States v. Hunter, 663 F.3d 1136, 1144 (10th Cir. 2011)
("the named person on a rental car agreement can authorize a
search of a rented car").

Drane has also not questioned that Lebo's consent was
voluntarily given, i.e., was "the product of an essentially free
and unrestrained choice." Schneckloth v. Bustamonte, 412 U.S.
218, 225 (1973).  As discussed supra, Trooper Kelly secured
Lebo's permission to search the vehicle by presenting her with
the standard form that the New Hampshire State Police use to
obtain consent for such searches, explaining to her that "she
didn't have to let us search the car at all if she didn't want
to" and that "if at any time she wanted to withdraw her consent,
she could do so."  So there seems to be no question that Lebo's
consent to search the vehicle was voluntary, see, e.g., United
States v. Brake, 666 F.3d 800, 806-08 (1st Cir. 2011), but,
again, Drane has not argued to the contrary.

---

rental agreement as an authorized driver," United States v.
Smith, 263 F.3d 571, 586 (6th Cir. 2001).  Our court of appeals
does not appear to have considered a non-renter's expectation of
privacy in a rental car but, in general, has cautioned that "[n]o
bright-line rule determines whether a person has a reasonable
expectation of a privacy in a vehicle." United States v.
Almeida, 748 F.3d 41, 47 (1st Cir. 2014).  Here, the prosecution
has not argued that Drane lacked a reasonable expectation of
privacy in the car rented by Lebo, so the court has simply
assumed that, in fact, he had such an expectation.

It is possible that, although consent to a search is voluntary, the evidence it turns up can still be suppressed as the fruit of the consenting party's unlawful detention, cf. Chaney, 647 F.3d at 408 n.10, on the theory that the consent does not purge the taint of the detention, see 4 LaFave, supra, § 8.2(d), at 102-104.  But Drane does not make that argument either.  In any event, Lebo was not unlawfully detained at the time she gave Trooper Kelly permission to search.

To the contrary, "the actions undertaken by the officer during the stop were reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop." United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998).  After Trooper Kelly stopped the Charger for speeding, he observed additional suspicious behavior almost immediately, as Drane leapt from the driver's seat into the backseat and pretended to be sleeping, while Lebo took his place in the driver's seat.  Though Lebo told Kelly that she and Drane had switched seats in hopes that he could avoid a citation for driving with a suspended license, Kelly was not obligated to accept outright that explanation for their suspicious behavior, see, e.g., Rabbia, 699 F.3d at 90, particularly in light of Drane's "leering" and "fidgeting"

(including an attempt to "jump out of the car" while Kelly was talking to Lebo), see, e.g., Chaney, 584 F.3d at 26.

Trooper Kelly was also entitled to ask Lebo and Drane about the origin and destination of their trip--indeed, an officer may ask such routine questions during a traffic stop more or less as a matter of course.  See United States v. Brigham, 382 F.3d 500, 508 & n.6 (5th Cir. 2004) (citing cases from several different federal courts of appeals).  Lebo and Drane gave answers to those questions that did not match up in all particulars and Drane, in doing so, displayed signs of drug intoxication, including constricted pupils.  Kelly then learned that Drane's record included "several entries for drug possession and possession with intent to distribute."  It was not until Trooper Kelly had gleaned all of this information that he asked Lebo for consent to search the vehicle--and his interactions with Drane and Lebo up until that point had only increased, and objectively so, his suspicions that the two were engaged in criminal behavior.  The brief intervening detention of Lebo and Drane, then, did not violate the Fourth Amendment.  See Sowers, 136 F.3d at 27 (ruling that officer had not exceeded the permissible scope of a Terry stop where, after he stopped the vehicle for a moving violation, his "attention shifted . . . toward a belief that the detainees

25

were engaged in more serious" criminal conduct, based on their
"excessive nervousness and the conflicting stories they told").

Finally, relying on Georgia v. Randolph, supra, Drane argues
that, "[b]ased on his expectation of privacy in the car, his
consent was necessary, especially because he was present."
Again, though, it is far from clear that Drane in fact had a
reasonable expectation of privacy in the car, see note 3, supra,
or that "Randolph, which involved a search of a residence,
applies in the context of a vehicle search." United States v.
Lumpkins, 687 F.3d 1011, 1014 (10th Cir. 2012) (suggesting that,
because Randolph relied on "the centuries-old principle of
respect for the privacy of the home," it does not apply to cars).

Even putting those concerns aside, however, Randolph is
still inapposite here.  That decision holds that "a physically
present inhabitant's express refusal of consent to a police
search is dispositive as to him, regardless of the consent of a
fellow occupant." 547 U.S. at 122-23.  Here, there is no
evidence that Drane refused to consent to a search of the rental
car.  Drane complains that he "was never asked for his consent,"
but that is wholly unavailing, in light of Randolph's teaching
that "a potential objector, nearby but not invited to participate
in the . . . colloquy [over consent], loses out" on his chance to
object.  Id. at 121 (emphasis added).  While the Court cautioned

that this rule governs only in the absence of "evidence that the police [] removed the potentially objecting [defendant] . . . for the sake of avoiding a possible objection," id. at 121, there is no evidence that the police did so here.  To the contrary, Trooper Cattabriga explained that he ordered Drane from the vehicle, handcuffed him, and removed him to a cruiser because his "furtive movements with his hands, ducking in and ducking out" while in the backseat of the Charger had caused Cattabriga concern for his safety.  In any event, Drane conceded during argument at the suppression hearing that he did not "think they purposely segregated" him from Lebo so he would not have the chance to object to the search.  Georgia v. Randolph does not invalidate Lebo's consent to search the car, or prevent the resulting evidence from being used against Drane at trial.  His motion to suppress the evidence discovered in the search of the Charger he was driving through Hampton, New Hampshire in September 2012 is denied.

**B.    Fifth Amendment claim**

Just before trial, Drane also moved to suppress evidence of statements he allegedly made during the September 2012 traffic stop, including his answer (in response to Trooper Cattabriga's questions) that he had last used drugs four days ago and preferred marijuana, as well as his comment, as he was being

27

moved from the Charger to a police cruiser, "Don't forget my crack pipe in the driver's door."  Drane argues that use of these statements against him at trial would violate the Fifth Amendment, as interpreted in Miranda, since, it is undisputed, he had not been warned of his rights to silence or counsel before he made the statements.

"Any statements obtained as a result of custodial interrogation in the absence of Miranda warnings must be suppressed," but "[c]ustodial interrogation requires that the defendant was both 'in custody' and subjected to 'interrogation.'"  United States v. Jackson, 544 F.3d 351, 356 (1st Cir. 2008).  In response to Drane's motion to suppress his statements, the prosecution argues principally that, at the time he made them, he was not in custody, but merely detained during a traffic stop.  See, e.g., United States v. Campbell, 741 F.3d 251, 265 (1st Cir. 2013) (discussing Berkemer, 468 U.S. at 437-40).  The prosecution also announced, however, that it did not intend to introduce, at trial, Drane's answers to Trooper Cattabriga's questions about his recent drug use.

This left, as the subject of Drane's second motion to suppress, only the "Don't forget the crackpipe" comment, and Drane did not argue, let alone adduce any evidence, that he made that statement in response to "interrogation," i.e., "words or

28

actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). To the contrary, the evidence is that Drane "simply blurted out the incriminating statement without prompting." Jackson, 544 F.3d at 351. Because this statement was not the product of custodial interrogation (even assuming, contrary to the prosecution's argument, that Drane was in custody at the time he uttered it), it is admissible against Drane at trial despite the fact that he did not receive Miranda warnings. See Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment"). His motion to suppress that statement is denied.

## IV.  **Conclusion**

For the foregoing reasons, Drane's motions to suppress (document nos. 28 and 72) are DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 30, 2014

cc:  Seth R. Aframe, AUSA
     Nick Abramson, AUSA
     Robert S. Carey, Esq.